Filed 6/29/15  P. v. Garcia CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON MICHAEL GARCIA,<br><br>    Defendant and Appellant. | D067452<br><br><br>(Super. Ct. No. RIF1202217) |

APPEAL from a judgment of the Superior Court of San Diego County, Elisabeth Sichel, Judge.  Affirmed as modified.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jason Michael Garcia was charged in an amended information with three counts of sexual misconduct involving his nine-year-old daughter,

Jane Doe 1 (i.e., counts 1-3),[1] and one count of sexual misconduct involving his 16-year-old stepdaughter, Jane Doe 2 (count 4).[2] The jury found defendant guilty of counts 1 through 3 and not guilty of count 4. The court sentenced defendant to a total term of 48 years to life in state prison.

On appeal, defendant contends the prosecutor, with the trial court's permission, violated his constitutional rights when the prosecutor on cross-examination questioned defendant about defendant's postarrest silence after defendant told the police words to the effect of "the truth would come" and "I want a lawyer." Defendant also claims he received ineffective assistance of counsel when trial counsel failed to object to evidence that Doe 1 had a sexually transmitted disease. Finally, defendant claims the trial court erred when it (i) failed sua sponte to instruct the jury properly; (ii) improperly admitted evidence of uncharged acts of sexual misconduct and of domestic violence; and (iii) imposed a $400 domestic violence fee and a $300 child abuse fine.

As we explain, we agree the trial court erred when it imposed the domestic violence fee and the child abuse fine. In all other respects, we disagree with defendant and accordingly affirm his judgment of conviction.

---

[1] Count 1 charged defendant with sexual intercourse or sodomy with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (a)); count 2 charged a lewd act on a child under the age of 14 years (Pen. Code, § 288, subd. (a)); and count 3 charged oral copulation or sexual penetration with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b)).

[2] Count 4 charged defendant with committing a lewd act on a child 14 or 15 years of age and more than 10 years younger than the defendant (Pen. Code, § 288, subd. (c)).

2

# FACTUAL BACKGROUND[3]

Doe 1 testified when she was five years old, defendant, her father, used his fingers to touch her "private part" where she "pee[d]" while she sat on his lap. Doe 1 said she felt "weird" and "scared" by the touching. This touching occurred while Doe 1 was living with her family, including Doe 2, in the Pepper Tree apartments.

Two days later, while watching television with defendant in the family's one-bedroom apartment, Doe 1 said defendant pulled his "hairy thing" from his pants, which she described as "[h]is private," and inserted it inside the "front part" of her "bottom." Doe 1 testified her pants were down to her knees when this occurred. Doe 1 said it hurt and she felt disgusted.

In 2009 when Doe 1 was seven years old, the family (including Doe 2) moved to the Plymouth Manor apartment. Doe 1 testified defendant had sexual intercourse with her five times while they were living at this location. Doe 1 stated defendant would touch her while her mother was in the living room on the computer and/or when her mother was taking a shower. Doe 1 also described how defendant on two occasions also put his "hairy thing" into her "back." When asked what she meant by her "back," Doe 1 said, "[m]y butt." Doe 1 said it "hurt" and felt "weird" when, after placing his "hairy thing" inside of her butt, he went "up and down." Defendant told Doe 1 if she told anyone about what he was doing he would go "far away," which made Doe 1 feel "scared" and "worried."

---

[3] We view the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.)

When Doe 1 was eight years old, the family moved to a house on Patterson Street. Doe 1 testified defendant put the "hairy thing" in her "bottom" about 30 times and in her "butt" about four times. In one incident, Doe 1 said her brother M., who was a couple years older than Doe 1, walked into Doe 1's bedroom while defendant was having intercourse with Doe 1.

Doe 1 testified defendant also put his "hairy thing" inside her mouth. Doe 1 recalled one such incident occurred in the garage, on top of the washing machine. Doe 1 testified her father placed her on top of the washer and while standing up, put his "hairy thing" into her mouth for about a minute. Doe 1 estimated her father put his "hairy thing" in her mouth about 15 times.

M., Doe 1's brother, testified when he was 11 years old he walked in to the bedroom he was sharing with his brothers and sisters, including Doe 1, and saw defendant "doing something to (Jane Doe 1)" while they were both laying down on the bed. M., however, stated both defendant and Doe 1 were clothed. M. testified at the time their mother was in the shower and his other brothers were outside playing. M. told his mother about the incident when she called the police.

Doe 2 testified defendant was her stepfather. When Doe 2 was about 14 or 15 years old, one night she had a bad dream and she went and got in bed with her mother and defendant. After Doe 2 fell asleep, she awakened to find defendant's hand touching her vagina over her clothes. Doe 2 stated her mother had back problems and often slept on the bedroom floor. Immediately after Doe 2 saw defendant's hand on her vagina, she rolled off the bed and hugged her mother.

4

Mother testified she met defendant in 2003, and they had four kids together but never married. Mother testified that Doe 1 experienced a burning sensation when she went "pee"; that the burning "went on for a while"; and that she told detectives about Doe 1's symptoms. Mother also testified that she took long showers, sometimes for 35 or 45 minutes.

In mid-April 2012, Doe 2 told mother that defendant had touched Doe 2's vagina while she was sleeping. Mother asked Doe 1 and her other daughter, D., who is about four years younger than Doe 1, whether defendant had touched them. Mother testified Doe 1 in response started "crying."

Shortly thereafter, mother confronted defendant in front of Doe 1 and D. Mother testified that without mentioning "what daughter," she told defendant, "'I can't believe what you did to my daughter.'" According to mother, defendant "looked at (Jane Doe 1), like, mad at her. He just walked out." According to mother, Doe 1 and D. were sitting on either side of her when she confronted defendant. Defendant, however, "immediately focused" his attention on Doe 1. Doe 1 told her mother she had been sexually abused by defendant. In shock, mother called police.

Mother testified defendant for years took medication for what she described as a "bladder infection" because he experienced pain when he urinated. According to mother, defendant began having pain in 2005 or 2006 when he used the bathroom and he complained of such pain "the whole time on and off."

Detective Jerilynn Czobakowski testified she along with another detective from the sexual assault team separately interviewed Does 1 and 2 at the police station in the early morning hours on or about April 17, 2012. The interviews were videotaped.

5

Czobakowski testified the first interview with Doe 1 was to determine whether there was probable cause to arrest defendant. A second interview of Doe 1 was conducted the following day by a professional child forensic interviewer. Both the probable cause and forensic interviews were played for the jury.

In the April 17 interview, Doe 1, who was then nine years old, stated that it was better to tell the truth than a lie; that defendant pulled "something out of his bottom and put it on my bottom" when she was about four or five years old; that her "bottom" was her "front part"; that she remembered it happened when her mother was sleeping on the couch in the living room and when the family lived at "Peppertree"; and that he has been "raping" her since then. When asked what "rape" meant, Doe 1 said it was when "[s]omebody who takes a little girl and uses them for something." Doe 1 told the detectives defendant stopped touching her two weeks before the interview. When asked why he stopped, Doe 1 said she did not know but perhaps because her mother started taking "quick" showers.

Doe 1 stated defendant told her he would be "really mad" if Doe 1 told her mother about the sex acts. Doe 1 also said she was afraid to tell her mother because defendant spanked her "real hard." Doe 1 told detectives she was wearing a shirt with flowers on it the last time defendant sexually abused her. Doe 1 was lying down on the bed when defendant pulled out his "thing from his private," "put it in my private" and "his body was going up and down."

Doe 1 told detectives that it "hurted" when defendant put his "thing" into her "bottom" and that as she got older, she was worried defendant "might do it to [her] other little sister." Doe 1 said defendant touched her when her mother was taking a shower or

6

when Doe 1 was sleeping. Doe 1 stated she once told defendant "'No'" when he was touching her and in response he said, "'F you.'"

When asked during the interview why Doe 1 finally decided to tell her mother about the sexual abuse, Doe 1 said she had always wanted to tell and then "something forces me not to and then after today like I'm -- I made that thing that's trying to force me like, um, I just -- I just let it go and said it. I said, 'You know mommy, he has touched me before,' and stuff."

As noted, the following day a forensic interview of Doe 1 was conducted. Doe 1 stated that defendant "raped" her beginning when she was about four or five years old. When asked what she meant by "rape," Doe 1 stated defendant did "nasty stuff." When asked what she meant by "nasty stuff," Doe 1 stated that defendant had "licked [her] bottom and he put something on [her] bottom when it's on his bottom and he moved up and down and it hurts really bad." When asked to elaborate about defendant licking her "butt," Doe 1 stated, "Not my butt" but instead her "front"; she also stated defendant "puts his tongue in it."

Doe 1 told the investigator that the licking occurred one time at the "Peppertree Apartments" while her mother was sleeping. Doe 1 awakened in the bottom bunk of the bunk bed and found her pants pulled down and defendant licking her. Doe 1 said she was "wet," felt scared and did not know what to do. Defendant told Doe 1, "'Don't tell mom. Don't tell anybody. Don't even speak about it.'"

Doe 1 also described for the interviewer defendant putting his "thing" into her bottom. She stated it happened in the Peppertree apartments; that defendant made her lie down and then put "something in [her] bottom" and he went "up and down and it hurted."

7

Doe 1 also described defendant's thing as "hairy." She stated defendant pulled her pants down, "shoved it in -- inside," and then "started going up and down and it hurted." Defendant stopped when Doe 1 said she needed to go to the bathroom. When she went to the bathroom, Doe 1 said it "[l]ooked kind of red in the middle."

Doe 1 also described for the interviewer an incident when they lived at the Peppertree apartments where defendant put his "thing" in her mouth. This incident took place in the bedroom when Doe 1 was six years old. Doe 1 was sitting on the bed and defendant was standing up. Doe 1 said during this incident defendant sometimes faced her and sometimes "the door." Doe 1 said it felt "gross" to have defendant's "hairy thing" in her mouth and when he was finished, she "spitted in the toilet and washed [her] mouth." Doe 1 said defendant told her not to tell her mother.

Doe 1 stated in the forensic interview that defendant also forced her to orally copulate him while she sat on the washer in the garage. Doe 1 noted these other incidents occurred in the family's "new" house. Doe 1 said defendant stopped during one such instance because her mother got out of the shower. Doe 1 said the oral copulation felt "weird and nasty" and it "tasted nasty," like "pee."

Doe 1 described an incident when her brother M. saw her and defendant together. According to Doe 1, M. said, "'What are you doing?'" Defendant stopped and told M., "'Nothing. She's just putting blankets away.'" Doe 1 told the interviewer this incident also occurred at the family's new house. Doe 1 said before M. came into the room, defendant pulled down his pants and put his "hairy thing in [her] bottom."

8

Finally, Doe 1 described an incident when she was eight when defendant put his "hairy thing inside [her] butt." Doe 1 told the investigator this incident occurred in the house. Doe 1 told the investigator when she went "poop" and wiped her "butt it hurts."

Forensic pediatrician Lorena Vivanco testified she performed a sexual assault examination on Doe 1 on April 18, 2012. Dr. Vivanco found no injuries, scars or bruises during Doe 1's genital or anal examinations. Dr. Vivanco also found Doe 1's hymen was intact. Dr. Vivanco nonetheless opined these findings were not inconsistent with a child who has been sexually abused because if "there's more than three days between [the] exam and the last incident, the chances to find anything is less than five percent. That is based on studies with, you know, thousands of kids."

Dr. Vivanco next took swabs for the cultures to test for sexually transmitted diseases. Dr. Vivanco stated all the cultures came back negative *except* the anal culture for Chlamydia, which was positive. Dr. Vivanco stated Chlamydia is known as the "'silent epidemic,' because patients can actually have infection and don't have any symptoms. That's why, right now, chlamydia is the number one sexually transmitted infection in the United States. Because of that, people can actually pass the infection without knowing that they have the infection." Dr. Vivanco opined Chlamydia is "highly contagious," and the bacteria is passed through "direct contact between tissues, because this bacteria lives inside of cells."

Dr. Vivanco testified Chlamydia is "very sensitive" to antibiotics and noted that many common antibiotics that are prescribed actually clear up such an infection. Dr. Vivanco reviewed a portion of defendant's medical records and found he was tested for Chlamydia in June 2012 and the test came back negative. However, she also found in

defendant's past medical history reports of him having "scar tissue in the urethra" in or about 2009; that defendant recently had surgery on his urethra; and that in her opinion, this was significant because in a "young male" such as defendant, there were "only . . . a few explanations for that scar tissue."  One such reason would be trauma, including from a motor vehicle accident or a pelvic fracture, and the other would be a "sexually transmitted infection, specifically from chlamydia."  According to Dr. Vivanco, defendant's medical records showed he was given antibiotics to treat bronchitis in early May 2009, which she noted would also have treated a Chlamydia infection.

Defendant testified in his own defense.  He stated Doe 1 was always in trouble including for "lying, beating up her little brothers and sisters, making mistakes in school a lot, lying to her teachers, not doing what she's supposed to do, having to stay in for recess all the time because she forgot to do something on her homework, or because of something she missed."

Defendant denied having any inappropriate contact with Doe 1 and stated he would never do anything like Doe 1 described.  Defendant testified he's been involved in at least 15 dirt bike crashes, dating back to when he was 11 years old.  Defendant also testified he and mother fought and he admitted sometimes he "smacked her around," including perhaps in front of their children.

## DISCUSSION

### I

Defendant contends the prosecutor, with the trial court's permission, committed prejudicial misconduct by questioning him about his postarrest silence in violation of *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).  Defendant further contends he received

10

ineffective assistance of counsel when his counsel failed both to object to the improper questions and to request the court to admonish promptly the jury to disregard such questions and any inferences that could be drawn from defendant's alleged silence.

A. *Brief Additional Background*

During cross-examination of defendant, the following exchange occurred between the prosecutor and defendant:

"[Prosecutor:]  Okay.  But good kids don't run around and make false allegations like, [m]y daddy puts a hairy thing in my butt; right?

"[Defendant:]  I don't know.  I don't know why she made that allegation.

"[Prosecutor:]  My question is, good kids don't run around making these crazy detailed allegations?

"[Defendant:]  Not that I know of.

"[Prosecutor:]  Right.  And you never once told Detective Czobakowski, who interviewed you, or Detective Beler that [Doe 1] is always lying or has trouble lying, did you?

"[Defendant:]  I never told the detective anything.

"[Prosecutor:]  Right.  But it's your testimony to this jury that you're innocent; right?

"[Defendant:]  Yes, I am.

"[Prosecutor:]  That your kids are falsely accusing you of these crimes; right?

"[Defendant:]  Yes, they are.

"[Prosecutor:]  So the very first thing that an innocent man does is try to clear his name; right?

11

"[Defendant:] Yes.

"[Prosecutor:] So the first thing you should have done was tell Detective Czobakowski, who was just here this morning, [Doe 1] is a compulsive liar; right?

"[Defense Counsel:] Objection. Argumentative, speculation.

"THE COURT: Overruled.

"[Defendant:] I told the detective that I said the truth will come out at the end. To get me a lawyer. That's all I said.

"[Prosecutor:] My question is this. You didn't tell Detective Czobakowski that [Doe 1] is a liar, did you?

"[Defendant:] I didn't tell her anything.

"[Prosecutor:] And you didn't tell her that [Doe 1] has been in trouble at school for lying to her teachers; right?

"[Defendant:] No I didn't."

Later, the prosecutor questioned defendant as follows:

"[Prosecutor:] Did you tell Detective Czobakowski you had been in all of these motor biking accidents?

"[Defendant:] I didn't tell her anything, and I told you that."

At the conclusion of defendant's testimony, defense counsel -- after a recess and outside the presence of the jury -- made the following observation:

"[Defense counsel:] I just want to note, during the cross of [defendant], there were some things that crossed over to error. I would just ask for an admonishment. That anything -- his choice to be silent with detectives should not be commented on in closing.

12

And any inference what he said would be false, because he didn't tell it to the detectives, would be improper.

"THE COURT:  Counsel[?]

"[Prosecutor:]  I would submit.  Thank you.

"THE COURT:  Well, obviously, during closing argument, I should not comment on his silence with the detective.  I'm trying to remember what might be error.

"[Defense Counsel:]  I believe the question on cross was, You didn't tell the detectives, X.  I don't remember what X was, but I believe that would be improper.

"THE COURT:  No, she just asked, Did you tell Detective . . . Czobakowski you had been in all of these motor biking accidents.  [¶]  And he said, I didn't tell her anything.  I told you that.  [¶]  Let's see.

"[Prosecutor:]  I believe I asked him the question, if he had told Detective Czobakowski that his daughter was a compulsive liar.  [¶]  He said, No, I told you I didn't tell her anything, or something to that effect.

"THE COURT:  Yeah.

"[Prosecutor:]  It might be -- I don't think that's error.  It's elicited the information that he didn't give that information to the detective that he invoked his rights.

"THE COURT:  Well, I guess we'll find out if there's a guilty verdict.

"[Defense Counsel:]  I'm just trying to remedy it from being commented on.

"THE COURT:  No, I agree.  It should not be commented on."

B.  *Guiding Principles and Analysis*

"In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following

13

*Miranda* warnings to impeach the defendant's trial testimony." (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*).) "[S]uch impeachment [is] fundamentally unfair because *Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him." (*Anderson v. Charles* (1980) 447 U.S. 404, 407–408.) "To establish a violation of due process under *Doyle,* the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument. [Citations.] 'The type of permission . . . will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate.' [Citation.]" (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.)

Here, we conclude on this record defendant has not established the prosecutor committed misconduct by using defendant's postarrest silence because the record is not clear whether and if so, when, defendant was given a *Miranda* advisement and thus, whether the prosecutor's questions actually referred to defendant's post-*Miranda* silence. (See *Fletcher v. Weir* (1982) 455 U.S. 603, 607 (*Fletcher*).) Similarly, assuming defendant *unambiguously* (see *People v. Tom* (2014) 59 Cal.4th 1210, 1215) invoked his Fifth Amendment privilege against self-incrimination when he told the detectives words to the effect of "the truth will come out in the end" and "I want a lawyer," it also is not clear from the record whether the prosecutor's questions of him on cross-examination referred to defendant's pre- or post-invocation silence.

Finally, the record also is not clear whether such questions by the prosecutor concerned defendant's failure *before arrest* to apprise the detectives that Doe 1 allegedly

14

was a liar, as defendant testified on direct, and/or that he sustained trauma to his urethra as a result of multiple dirt bike accidents.  (See *Jenkins v. Anderson* (1980) 447 U.S. 231, 240-241 [holding there is no constitutional impropriety when a prosecutor uses a defendant's *prearrest* silence for impeachment purposes because "no governmental action induced [the defendant] to remain silent before arrest"]; see also *Fletcher*, *supra*, 455 U.S. at p. 604, fn. 1.)

Moreover, we conclude there was no *Doyle* error in this case for the separate and independent reason that defendant cannot show the trial court permitted the prosecution to engage in such inquiry or argument.  Indeed, the record shows defense counsel did *not* object to the prosecutor's question concerning why defendant did not advise Detective Czobakowski he sustained injury to his urethra as a result of multiple crashes on a dirt bike and only objected to the questions about Doe 1 and her being a liar *not* on the basis of *Doyle* error, but rather on the basis such questions were allegedly "argumentative" and "speculative."  Defendant thus cannot sustain his burden to show the trial court gave the prosecutor permission to question defendant on these subject matters.  (See *Collins*, *supra*, 49 Cal.4th at p. 198 [recognizing the general rule that a "'"defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—*and on the same ground*—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety"'" (italics added)].)

Moreover, even assuming there was *Doyle* error in the instant case, we nonetheless conclude it was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

15

First, the record shows the trial court out of an abundance of caution admonished the jury sua sponte that a "defendant has an absolute right to be silent when questioned by the police. You may not consider the defendant's silence for any reason, nor are you to discuss it in any way during your deliberations." Although defendant contends this instruction was insufficient, we note from the record he did not object to this instruction or request a more explicit instruction. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1120.) In any event, we conclude this instruction was sufficient to inform the jury it was to disregard the prosecutor's allegedly improper questioning of defendant regarding his alleged postarrest silence and to reject any inferences to be drawn from that silence, particularly in light of the additional instruction that an attorney's statements and questions were not evidence. (See *People v. Adams* (2014) 60 Cal.4th 541, 578 [noting absent evidence in the record otherwise, a court may presume the jury followed the instructions given by the trial court].)

Second, the prosecutor's questioning of defendant concerning why he did not inform detectives that Doe 1 allegedly was a liar and/or that his urethra was injured when he was young as a result of multiple dirt bike accidents was brief, the points sought to be made by the prosecutor as a result of such questions were *not* repeated, and the inference or inferences the prosecutor asked the jury to draw from such questions were in our view weak and unpersuasive as a form of adoptive admission or consciousness of guilt.

Indeed, the questioning of defendant that he did not mention to Detective Czobakowski that Doe 1 was a liar was merely cumulative to the much more comprehensive testimony of defendant on both direct examination and cross-examination on the *same* subject matter: that the allegations of sexual misconduct made by Doe 1

16

were both made up and entirely untrue. Thus, we conclude such questioning, even *if* improper, was not prejudicial and thus harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

We reach the same conclusion with regard to the *single* question the prosecutor asked defendant regarding why he did not tell detectives—after he allegedly invoked his Fifth Amendment privilege—that his urethra had been injured when he was young. Defendant's alleged postarrest silence with respect to this question was at best of marginal probative value and thus not prejudicial and incriminating because the record strongly suggests defendant could not have known at the time of such questioning that Doe 1 would test positive for Chlamydia a few days later, a point we note the defense also easily could have made on redirect.[4]

Third, although defendant argues otherwise, the record includes evidence that, if credited (as turned out to be the case), overwhelmingly supports the defendant's conviction on counts 1, 2 and 3. We have summarized this evidence *ante*. Although defendant attacks certain inconsistencies in the evidence, including in the trial testimony of Doe 1, on the one hand, and in the statements she made in the probable cause and forensic interviews, on the other, we conclude such inconsistencies went to weight and not admissibility and ostensibly were considered by the jury in deciding guilt. (See *People v. Sully* (1991) 53 Cal.3d 1195, 1242; see also *United States v. Lopez* (9th Cir. 2007) 500 F.3d 840, 845 [noting that "'[w]hen deciding whether a prosecutor's reference

---

[4]    Defendant's probation report noted he was interviewed and arrested on April 16, 2012. The record shows Doe 1 was not examined and tested for sexually transmitted diseases until at least April 18, 2012, as Dr. Vivanco testified.

17

to a defendant's post-arrest silence was prejudicial, this court will consider the extent of comments made by the witness, whether an inference of guilt from silence was stressed to the jury, and the extent of other evidence suggesting defendant's guilt'"].)

In light of our conclusion that there was no *Doyle* error and even assuming such error, that it was harmless beyond a reasonable doubt under the *Chapman* standard, we likewise reject defendant's alternate contention that he received ineffective assistance of counsel when his trial counsel failed to object *on proper grounds* to the alleged improper questions of the prosecutor regarding his alleged postarrest silence and/or failed to request the trial court to promptly admonish the jury not to consider any evidence including consciousness of guilt allegedly resulting from such inquiry. (See *Strickland v. Washington* (1984) 466 U.S. 668, 691-692 (*Strickland*) [noting to establish ineffective assistance of counsel, a defendant must show: (1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant].)

## II

Defendant next contends he received ineffective assistance of counsel when the defense failed to object pursuant to Evidence Code section 352[5] to Dr. Vivanco's testimony that Doe 1 tested positive for rectal Chlamydia and that, based on her review of a portion of defendant's medical records, defendant previously exhibited symptoms

---

5     Evidence Code section 352 provides a court, in its discretion, may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

18

consistent with the same infection even though he subsequently tested negative for Chlamydia.

We conclude defendant cannot show either deficient performance or prejudice (see *Strickland*, *supra*, 466 U.S. at pp. 691-692) because we conclude the testimony of Dr. Vivanco was properly admitted into evidence. As summarized *ante*, Dr. Vivanco testified Chlamydia was highly contagious and was *only* transmitted by direct contact between tissues. In this case, Doe 1 testified that defendant had anal intercourse with her and that it hurt when she "poop[ed]." The fact Doe 1 not only had a sexually transmitted disease, but in her rectum, when she was just nine years old increased the probative value of this evidence in light of Doe 1's testimony.

In reaching our conclusion, we reject defendant's unsupported contention that such evidence was not probative because Doe 1 allegedly contracted the infection outside the time frame of the charged offenses in counts 1 and 2 and because defendant would not have had the infection after he was administered antibiotics in May 2009. Instead, as we have noted, the evidence of the presence of Chlamydia in Doe 1's rectum was highly probative in light of her testimony that defendant engaged in anal intercourse with her after the family moved to the Plymouth Manor apartment. (See Evid. Code, § 1108, subd. (a) ["In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352"].)

That evidence is highly damaging to defendant does not make it unduly prejudicial for purposes of Evidence Code section 352, subdivision (b). "Prejudice for purposes of

19

Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with *very little effect on issues, not evidence that is probative of a defendant's guilt*." (*People v. Crew* (2003) 31 Cal.4th 822, 842, italics added.)

Moreover, that defendant did not test positive for Chlamydia after the allegations of sexual misconduct arose in this case does not change our conclusion that evidence Doe 1 had rectal Chlamydia was properly admitted. As also summarized *ante*, Dr. Vivanco testified that her review of defendant's medical records showed he had surgery in 2009 to remove scar tissue from his urethra, which she opined could have been caused by Chlamydia, which she noted is a "silent epidemic." Dr. Vivanco further opined that Chlamydia can be treated by a broad array of common antibiotics and that defendant's medical records showed he took erythromycin in May 2009 for bronchitis. Dr. Vivanco opined taking erythromycin would in fact cure a Chlamydia infection.

In light of such testimony by Dr. Vivanco, we conclude the fact that defendant did not test positive for Chlamydia and that he proffered various other explanations or theories to cast doubt on how Doe 1 contracted rectal Chlamydia, did not prevent the admission of such evidence, as that went to weight and not admissibility. Because we conclude this evidence was properly admitted, we also conclude defendant cannot show that his counsel's performance was deficient in failing to object to such testimony and/or that he was prejudiced as a result thereof. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 502 [noting that "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance"]; see also *People v. Lucero* (2000) 23 Cal.4th 692, 728-729 [noting the general rule that when "'the record sheds no light on

20

why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons'"].)

III

Defendant next contends the trial court erred when it failed sua sponte to instruct the jury with CALCRIM No. 1193,[6] the standard jury instruction concerning the limited use of child sexual assault accommodation syndrome (CSAAS) evidence. Defendant contends this instruction was required because as summarized *ante*, Detective Czobakowski briefly testified regarding why some children tend not to disclose right away they were victims of sexual abuse and the reason or reasons they tend to wait to make such disclosure.

Absent a request by a party, there generally is no duty to give an instruction limiting the purpose for which evidence otherwise admissible may be considered. (*People v. Smith* (2007) 40 Cal.4th 483, 516.) In any event, we need not decide whether the trial court erred in failing sua sponte to instruct the jury with CALCRIM No. 1193 because on this record we conclude that even *if* Detective Czobakowski's testimony could be considered CSAAS evidence, as defendant assumes, any such alleged error in failing to give this instruction was harmless. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

---

6    CALCRIM No. 1193 provides: "You have heard testimony from _____ < *insert name of expert* > regarding child sexual abuse accommodation syndrome. [¶] _____'s < *insert name of expert>* testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not _____'s < *insert name of alleged victim of abuse* > conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony."

21

Indeed, the record shows Detective Czobakowski testified *generally* about why some children wait to report sexual abuse. Detective Czobakowski's testimony was thus limited to a class of victims as opposed to Doe 1 in particular. We thus conclude the jury in this case could not improperly imply from Detective Czobakowski's testimony that she had determined that Doe 1 was in fact sexually abused or that Doe 1 specifically exhibited behavior typical of sexual abuse victims.

In addition, the record shows Detective Czobakowski testified that some children disclose sexual abuse right away; that others wait to disclose; and that it "depends on the child." Although Detective Czobakowski testified in her experience children generally tend to wait to disclose sexual abuse and it would not surprise her if a child waited four or five years to make such disclosure, we conclude on the whole such mixed testimony on when disclosure generally occurs eliminated any risk of misuse by the jury to rely on such evidence to find that the sexual abuse of Doe 1 did in fact occur.

Our conclusion is buttressed by the following cross-examination of Detective Czobakowski:

"[Defense Counsel:] You indicated on direct -- [the prosecutor] asked some questions about normal things in these kind of cases. And you indicated you had seen a lot of them, a lot of these kind of child abuse cases.

"[Detective Czobakowski:] Yes.

"[Defense Counsel:] Have you seen all different kinds of scenarios? Do some kids report after the first time something happens to them?

"[Detective Czobakowski:] Occasionally.

"[Defense Counsel:] And some kids it's years?

22

"[Detective Czobakowski:]  Yes.

"[Defense Counsel:]  Any everything in between.  Would that be a fair statement?

"[Detective Czobakowski:]  Yes.

"[Defense Counsel:]  Okay.  Would it be fair to say there really aren't norms?  It depends on the kid.  It depends on the family situation and on who they are accusing?

"[Detective Czobakowski:]  I would say that's correct."

Detective Czobakowski's testimony on cross-examination further supports our conclusion a jury could not imply, from Detective Czobakowski's general testimony regarding why some children wait to disclose sexual abuse, that Doe 1 was in fact sexually abused by defendant.

Finally, we note this line of questioning was brief and as we noted *ante*, the evidence against defendant was strong, including the fact Doe 1 was generally consistent in her description of where, when and how she had been sexually abused by defendant and the fact she had a sexually transmitted disease.  For this additional reason, we conclude any error in failing to instruct the jury with CALCRIM No. 1193 was harmless.

IV

Defendant contends the trial court abused its discretion when it ruled to admit evidence of uncharged sexual misconduct occurring at the Plymouth Manor apartment where the family lived between 2009 to 2010.  According to defendant, because the amended information did not include any charges between November 2008 through November 2010, the court should have excluded all evidence of any alleged sexual abuse during this period.

23

In rejecting this argument, the trial court noted that "a lot of times the kids can't be very specific about what happened when and which happened whenever, and I also think it could be a two-edged sword because it could also go to their credibility if they say it happened every night. Sometimes they say it happened every night since they were five and they're 15. So I think it cuts both ways. I think it is something that is important for the jury to know either way it cuts, because if the jury did believe it was ongoing, that would explain why they may be a little hazy on the details of the particular incident that's charged, and, on the other hand, if it's -- the amount of times they allege is ludicrous given the factual scenario at trial, then that goes to their credibility. So I'm gonna allow it in. So I'm denying -- if what we're talking about is the number of molests and where they occurred and so forth."

A. *Guiding Principles*

As a general rule, evidence of a person's character is inadmissible to prove conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).)[7] Section 1108 is an exception to this general rule. Subdivision (a) of this statute provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

"[T]he Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases. . . . [¶] Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints

_____

[7]    All further statutory references are to the Evidence Code unless otherwise indicated.

section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).)

In determining whether to admit section 1108 propensity evidence of a defendant's prior sexual offense, a court should "engage in a careful weighing process under section 352. Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.)

We review the trial court's admission of section 1108 evidence, including its section 352 weighing process, for abuse of discretion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104–1105.) "We will not find that a court abuses its discretion in admitting such other sexual acts evidence unless its ruling '"falls outside the bounds of reason."'" (*Id.* at p. 1105.)

B. *Analysis*

We conclude the trial court properly exercised its discretion when it ruled to admit the uncharged sexual offenses involving Doe 1 at the Plymouth Manor apartment. The record shows the uncharged offenses were similar to the charged offenses; they involved

25

the same victim; they occurred close in time to the charged offenses; and they occurred under circumstances that were similar to the charged offenses (i.e., in the family's residence and/or when Doe 1's mother was in the shower).

In addition, the record shows the sexual abuse began when Doe 1 was four or five years old. As noted by the trial court, with young witnesses like Doe 1 that have been abused for years it often is difficult for such a witness to recall with specificity when a particular sexual offense occurred, particularly in cases such as the instant one where a victim has testified to myriad acts of sexual misconduct. For this additional reason, we conclude the court properly exercised its discretion when it ruled to admit the sexual offenses involving Doe 1 at the Plymouth Manor apartment. Such evidence was also relevant on the issue of Doe 1's credibility, or lack thereof, as noted by the trial court.

Defendant nonetheless contends the trial court erred in admitting the uncharged sexual offenses because those offenses were more inflammatory than the charged offenses. We disagree. While the uncharged offenses at the Plymouth Manor apartment included acts of sodomy, we conclude such uncharged offenses were no more inflammatory than the charged offenses, which involved myriad instances of alleged sexual misconduct of Doe 1 by defendant, including sexual intercourse and oral copulation (i.e., on the washing machine in the garage in the family home) that Doe 1 described in detail.

We thus conclude the trial court did not abuse its discretion in admitting the sexual offenses involving Doe 1 while the family lived in the Plymouth Manor apartment. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1286 [noting a court of review will not reverse a

26

trial court's exercise of discretion under §§ 1108 and 352 unless its decision was arbitrary, capricious or patently absurd and resulted in a manifest miscarriage of justice].)

In any event, even *if* the court erred in admitting the uncharged sexual offenses that occurred while the family lived at the Plymouth Manor apartment, we conclude that error was harmless because even absent the error it is not reasonably probable the outcome would have been more favorable to defendant as the evidence of defendant's guilt was strong. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

V

Defendant next contends the trial court abused its discretion when it allowed the prosecutor to ask mother if defendant was violent toward her. The record shows the defense on cross-examination of mother elicited testimony that she and defendant argued often and, over the prosecution's objection, that defendant at some point told mother that the only way she was going to take the children away from him was if he was "in jail or dead."

The record shows on redirect, mother testified defendant would make these statements when she threatened to take the children and leave defendant after they would argue. According to mother, defendant got "out of control sometimes" when it came to disciplining their children. It was in these instances defendant told mother the only way she was taking the children and leaving was if he was in jail or dead. Mother, over defendant's objection, next testified defendant used to hit her and sometimes did so in front of the children. Mother, again over defendant's objection, testified she did not know why defense counsel on cross-examination had asked her the question about whether

27

defendant had made such a statement (i.e., about being in jail or dead with respect to the children).

Immediately thereafter, the record shows the following colloquy between the prosecutor and mother:

"[Prosecutor:]  Did you put your kids up to this?  Did you make up this elaborate story that they have been molested to get out of this marriage?

"[Mother:]  Well, I wouldn't do that.  I wouldn't even hurt my kids in that way.  If I wanted to leave, I would have left.  That's the worst part, you know, that it did happen that way.

"[Prosecutor:]  You wouldn't -- would you want your kids to have to be subjected to three separate interviews by detectives?

"[Mother:]  No.

"[Prosecutor:]  Would you want your little 9-year-old to have to be medically examined by a doctor?

"[Mother:]  No.

"[Prosecutor:]  Would you want to have to get on the stand in front of a bunch of strangers and tell awful details?

"[Mother:]  No."

The record shows at the conclusion of this testimony, outside the presence of the jury, the trial court asked if there was anything else that needed to be put on the record. The prosecutor responded, "I just wanted to go into the reason why I asked the question the second time on redirect about mother being hit by the defendant was because [defense counsel] opened the door with asking about the defendant's statements to her."  The court

28

responded, "No, I understood. It also went to her motive or possible animus towards the defendant. So that's why I allowed it once it had come up on cross."

Finally, during closing argument the defense argued as follows: "You heard [mother]. [Mother] said Mr. Garcia told her multiple times, [t]he only way you will take my kids is if I am dead or in jail. [¶] [The prosecutor] said why not report a domestic violence incident? You heard Mr. Garcia say the police responded multiple times. No one was ever arrested. [¶] [Mother] knew that wasn't enough. That didn't work."

We conclude the trial court properly exercised its discretion when it overruled the defense's objection and allowed mother to testify on redirect that defendant used to hit her, including in front of the kids. This testimony was relevant, as it tended to rebut the statements that the only way mother was taking the children from defendant was if he was *in jail* or dead. That is, once the defense opened the door by asking mother whether defendant made these statements, the prosecutor was entitled to ask mother about their relationship, including domestic violence, to show if mother wanted defendant incarcerated, she merely could have called the police when defendant hit her, rather than allegedly coach and/or encourage her daughters Does 1 and 2 to lie and make up the allegations of sexual misconduct, as the defense theorized.

In addition, we reject defendant's contention for the separate and independent reason that the defense itself used the evidence of domestic violence in closing to support its theory that mother wanted her husband in jail and that when she realized domestic violence was not "enough" to accomplish this feat, she instead had her daughters make up the allegations of sexual misconduct against her husband, defendant. Clearly, defendant

29

cannot argue it was error to admit such evidence, as he has done on appeal, while at the same time rely on such evidence to show his innocence, as he did at trial.

Finally, even *if* the court erred in overruling defendant's objection to the domestic violence evidence, we conclude that error was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Indeed, even absent such error it is not reasonably probable the outcome would have been more favorable to defendant, as the evidence of defendant's guilt was strong. (See *ibid.*)[8]

## VI

Lastly, defendant contends, and the People concede, that the court erred in imposing a $400 domestic violence fund fee and a $300 child abuse fee.[9] We agree with the parties. (See Pen. Code, former § 1203.097, subd. (a) [noting statute applies when a person is granted *probation* for a qualifying offense]; Pen. Code, § 294, subd. (a) [limiting a fine imposed to various qualifying offenses, none of which apply here].)

---

[8] In light of our rejection of defendant's myriad claims of error, we need not address his cumulative error claim.

[9] With respect to the $300 fee, the record shows the court imposed the fee at the sentencing hearing, but the minute order shows the fee was imposed *and* waived. As a result of the conflict, the oral pronouncement prevails over the minute order. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2.)

30

DISPOSITION

The judgment is modified to strike the $400 domestic violence fund fee and the

$300 child abuse fee.  As modified, the judgment is affirmed.  The trial court is directed

to prepare an amended and corrected abstract of judgment and transmit the same to the

Department of Corrections and Rehabilitation.


BENKE, Acting P. J.

WE CONCUR:


NARES, J.


HALLER, J.


31